RECEIVED
02/02/2026
KELLY L. STEPHENS, Clerk

Case No. ______

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

COMMONWEALTH OF KENTUCKY,

*Petitioner*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY and
LEE M. ZELDIN, in his official capacity as Administrator
of the U.S. Environmental Protection Agency,

*Respondents*

* * *

# PETITION FOR REVIEW

Under 42 U.S.C. § 7607(b)(1), Federal Rule of Appellate Procedure 15, and Sixth Circuit Rule 15, Petitioner the Commonwealth of Kentucky petitions this Court for review of the final agency action taken by Respondents the United States Environmental Protection Agency and Lee M. Zeldin, in his official capacity as Administrator of the United States Environmental Protection Agency, entitled "Air Plan Approval and Air Quality Designation; KY; Redesignation of the Kentucky Portion of the Louisville, KY-IN 2015 8-Hour Ozone Nonattainment Area to Attainment," published at 91 Fed. Reg. 3,838 (Jan. 29, 2026). A copy of the agency action is attached to this petition.

Petitioner will show that the agency action is not in accordance with law and otherwise is in excess of the agency's statutory authority, arbitrary, capricious, and an

abuse of discretion. Petitioner thus asks that this Court declare unlawful and vacate the agency's final action.

Respectfully submitted,


**RUSSELL COLEMAN**
**Attorney General of Kentucky**

/s/ Jacob M. Abrahamson
Matthew F. Kuhn
*Solicitor General*
John H. Heyburn
*Principal Deputy Solicitor General*
Jacob M. Abrahamson
*Deputy Solicitor General*

Office of the Kentucky
Attorney General
1024 Capital Center Drive,
Suite 200
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jack.Heyburn@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for Petitioner*
*Commonwealth of Kentucky*

## CERTIFICATE OF SERVICE

I certify that on February 2, 2026, I served a copy of this Petition for Review by United States first-class mail on the following:

Lee M. Zeldin, Administrator
United States Environmental Protection Agency
Office of the Administrator
Mail Code 1101A
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

Correspondence Control Unit
Office of General Counsel
United States Environmental Protection Agency
Mail Code 2311
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

The Honorable Pamela Bondi
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

/s/ Jacob M. Abrahamson
*Counsel for Petitioner*

# ATTACHMENT

*I. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*J. National Technology Transfer and Advancement Act (NTTAA)*

Section 12(d) of the NTTAA directs the EPA to use voluntary consensus standards in its regulatory activities unless to do so would be inconsistent with applicable law or otherwise impractical. The EPA believes that this action is not subject to the requirements of section 12(d) of the NTTAA because application of those requirements would be inconsistent with the CAA.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

*L. Petitions for Judicial Review*

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by March 30, 2026. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this rule for the purposes of judicial review, nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements (see section 307(b)(2)).

**List of Subjects in 40 CFR Part 52**

Environmental protection, Air pollution control, Ammonia, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Particulate matter, Reporting and recordkeeping requirements, Sulfur oxides, Volatile organic compounds.

Dated: January 21, 2026.

**Michael Martucci,**

*Acting Regional Administrator, Region IX.*

For the reasons stated in the preamble, the Environmental Protection Agency amends part 52, chapter I, title 40 of the Code of Federal Regulations as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart F—California

■ 2. Section 52.247 is amended by adding paragraph (s) to read as follows:

**§ 52.247 Control Strategy and regulations: Fine Particle Matter.**

* * * * *

(s) *Determination of attainment.* Effective March 2, 2026, the EPA has determined that, based on 2022 to 2024 ambient air quality data, the San Joaquin Valley $PM_{2.5}$ nonattainment area has attained the 1997 annual $PM_{2.5}$ NAAQS by the applicable attainment date of December 31, 2024. Therefore, the EPA has met the requirement pursuant to CAA section 179(c)(1) to determine whether the area attained the standards. Under the provisions of the EPA's $PM_{2.5}$ implementation rule (see 40 CFR 51.1015), this determination suspends the requirements for this area to submit an attainment demonstration, a reasonable further progress plan, quantitative milestones, quantitative milestone reports, contingency measures, and any other planning SIP revisions related to attainment for as long as this area continues to attain the 1997 annual $PM_{2.5}$ NAAQS. If the EPA determines, after notice-and-comment rulemaking, that this area no longer meets the 1997 annual $PM_{2.5}$ NAAQS, the corresponding determination of attainment for that area shall be withdrawn.

[FR Doc. 2026–01766 Filed 1–28–26; 8:45 am]

BILLING CODE 6560–50–P

---

## ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 81

**[EPA–R04–OAR–2022–0789; FRL–10888–02–R4]**

## Air Plan Approval and Air Quality Designation; KY; Redesignation of the Kentucky Portion of the Louisville, KY-IN 2015 8-Hour Ozone Nonattainment Area to Attainment

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final determination.

**SUMMARY:** The Environmental Protection Agency (EPA) is denying the request to redesignate the Kentucky portion of the Louisville, Kentucky-Indiana, 2015 8-hour ozone nonattainment area (hereinafter referred to as the ''Louisville, KY-IN Area'' or ''Area'') to attainment for the 2015 8-hour ozone National Ambient Air Quality Standards (NAAQS or standards). EPA is taking no action at this time on Kentucky's maintenance plan, including the regional motor vehicle emission budgets for nitrogen oxides ($NO_X$) and volatile organic compounds (VOC) for the years of 2019 and 2035, submitted with Kentucky's redesignation request for the Louisville, KY-IN Area. The redesignation request and the maintenance plan state implementation plan (SIP) revision were submitted by the Commonwealth of Kentucky, through the Kentucky Energy and Environment Cabinet (Cabinet), Division for Air Quality (KDAQ), on September 6, 2022.

**DATES:** This rule is effective March 2, 2026.

**ADDRESSES:** EPA has established a docket for this action under Docket Identification No. EPA–R04–OAR–2022–0789. All documents in the docket are listed on the regulations.gov website. Although listed in the index, some information may not be publicly available, *i.e.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Air Regulatory Management Section, Air Planning and Implementation Branch, Air and Radiation Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW, Atlanta, Georgia 30303–8960. EPA requests that, if at all possible, you contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section to schedule your inspection. The Regional Office's official hours of business are Monday through Friday 8:30 a.m. to 4:30 p.m., excluding Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Simone Jarvis, Air Regulatory Management Section, Air Planning and Implementation Branch, Air and Radiation Division, Region 4, U.S. Environmental Protection Agency, 61 Forsyth Street SW, Atlanta, Georgia 30303–8960. The telephone number is (404) 562–8393. Ms. Jarvis can also be reached via electronic mail at *Jarvis.Simone@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

On October 1, 2015, EPA revised both the primary and secondary NAAQS for ozone to a level of 0.070 parts per million (ppm). *See* 80 FR 65292, October 26, 2015. For ozone, an area may be considered to be attaining the 2015 8-hour ozone NAAQS if it meets those standards, as determined in accordance with 40 CFR 50.19 and Appendix U of 40 CFR part 50, based on three complete, consecutive calendar years of quality-assured air quality monitoring data. To attain the 2015 8-hour ozone NAAQS, the 3-year average of the annual fourth-highest daily maximum 8-hour average ozone concentrations measured at each monitor within an area must not exceed 0.070 ppm. Based on the data handling and reporting convention described in 40 CFR part 50, Appendix U, the 2015 8-hour ozone NAAQS are attained if the design value (DV) is 0.070 ppm or below. The data must be collected and quality-assured in accordance with 40 CFR part 58 and recorded in EPA's Air Quality System (AQS).

As part of the designations process for the 2015 8-hour ozone NAAQS, the Louisville, KY-IN Area (Clark and Floyd Counties in Indiana, and Bullitt, Jefferson, and Oldham Counties in Kentucky) was designated as a Marginal ozone nonattainment area, effective August 3, 2018. *See* 83 FR 25776, June 4, 2018. Areas that were designated as Marginal ozone nonattainment areas were required to attain the 2015 8-hour ozone NAAQS no later than August 3, 2021, based on 2018–2020 monitoring data. The Louisville, KY-IN Area was reclassified by operation of law from Marginal to Moderate nonattainment on October 7, 2022, following EPA's finding of failure to attain by the Marginal area attainment date. *See* 87 FR 60897, and 40 CFR 81.318. 2015 ozone Moderate areas are to attain the 8-hour ozone NAAQS as expeditiously as practicable, but no later than August 3, 2024, six years after the effective date of the initial nonattainment designations. *See* 40 CFR 51.1303.

On February 21, 2022, the Indiana Department of Environmental Management (IDEM) submitted a redesignation request and maintenance plan for the 2015 8-hour ozone NAAQS for Clark and Floyd Counties in the Indiana portion of the Louisville, KY-IN Area. On May 18, 2022, EPA proposed to approve the request to redesignate the Indiana portion of the Area. *See* 87 FR 30129. On July 5, 2022, EPA finalized approval of the redesignation request and maintenance plan for the Indiana portion of the Louisville, KY-IN Area. *See* 87 FR 39750.

On September 6, 2022, KDAQ submitted a redesignation request and maintenance plan for the Kentucky portion of the Louisville, KY-IN Area. On April 18, 2023, EPA proposed to approve KDAQ's redesignation request and maintenance plan SIP revision based, in part, on complete, quality-assured, and certified 2019–2021 DVs for each monitor in the Louisville, KY-IN Area. *See* 88 FR 23598, April 18, 2023. These DVs are equal to or less than the level of the 2015 8-hour ozone NAAQS and were the most current DVs at the time of proposal.

## II. Violation of the NAAQS for Ozone in the Louisville, KY-IN Area

Although data indicated an attaining DV at the time of the proposed approval, the Area preliminarily violated the 2015 8-hour ozone standards in June 2023. Through a NPRM published on January 3, 2025, EPA withdrew its proposed approval of KDAQ's redesignation request and proposed instead to deny the request because the Area did not meet the first statutory criterion for redesignation to attainment. *See* 90 FR 294. At the time of the proposed denial, the certified DV for 2021–2023 for the Area was 0.072 ppm, which exceeded the standard of 0.070 ppm.[1]

After the close of the comment period for the proposed denial, the Louisville Metro Air Pollution Control District (LMAPCD) submitted an Exceptional Events (EE) demonstration for nine days in 2023 at the Cannons Lane monitor, believed to have been influenced by the 2023 Canadian Wildfires. However, the EE demonstration did not have regulatory significance for this action because concurrence on all nine days would not affect the relevant analysis. Since the proposed denial, EPA received certified 2024 monitoring data indicating a 2022–2024 DV of 0.074 ppm for the Area. The data shows that even with EE concurrence on all nine days, the 2022–2024 DV would still exceed the NAAQS. Thus, notwithstanding the EE demonstration, the Louisville, KY-IN Area does not meet the first statutory criterion for redesignation to attainment of the 2015 8-hour ozone NAAQS.

In this final rule, EPA is finalizing the denial of the KDAQ's September 6, 2022, request to redesignate the Kentucky portion of the Louisville, KY-IN, nonattainment area to attainment for the 2015 8-hour ozone NAAQS. Comments on the NPRM were due on or before February 3, 2025. EPA received five adverse comments and one supportive comment on the NPRM.

## III. Response to Comments

EPA received adverse comments from the Greater Louisville Inc., the Metro Chamber of Commerce; the Commonwealth of Kentucky, Office of the Attorney General; LMAPCD; KDAQ; and the public, (collectively, the ''commenters'') as well as a set of supportive comments from Kentucky Resources Council, Inc. and Sierra Club.[2] All comments received are available in the docket for this action. In this section of this document, EPA has summarized and grouped, for clarity and ease of discussion, the significant adverse comments and responded to them.

*Comment 1:* Several commenters argue that CAA section 107(d)(3)(E)(i)'s requirement that a nonattainment area ''has attained'' the NAAQS does not require that the area continue to attain the NAAQS after submission of a redesignation request. One commenter asserts that because KDAQ's redesignation request was based on data from 2019 to 2021, EPA's action ''must be based on monitoring data from that period or snapshot, not subsequent years.'' Another commenter also argues that EPA's decision should ''have been based on 2019–2021 monitoring data which demonstrated attainment.'' EPA received comments asserting that the 2019 to 2021 monitoring data demonstrates that the Area meets the 2015 ozone NAAQS and that relying on DVs beyond these years is both impermissible and prohibits a fair and equitable assessment of Kentucky's redesignation request. Commenters argue that EPA's approach is ''inconsistent with the established process for evaluating redesignation requests, contrary to the statute governing these requests, and undermines the objective of fairly assessing the air quality status during the specified 3-year period.''

In the January 3, 2025 NPRM, EPA cited two cases where courts have agreed with EPA that CAA section 107(d)(3)(E)(i) requires continuing attainment until redesignation—*Southwestern Pennsylvania Growth*

[1] Final air quality DVs for all criteria pollutants, including ozone, are available at *https://www.epa.gov/air-trends/air-quality-design-values.* These DVs are calculated in accordance with 40 CFR part 50.

[2] As mentioned above, EPA initially proposed approving KDAQ's redesignation request on April 18, 2023. In response to that proposal, EPA received several adverse comments. As explained in the January 3, 2025, NPRM, those comments are moot because EPA withdrew its proposed approval, and EPA has determined that it is therefore unnecessary to respond to them.

*Alliance* v. *Browner,* 121 F.3d 106 (3d Cir. 1997) (hereinafter *Browner*) and *Commonwealth of Kentucky* v. *EPA,* No. 96–4274, 1998 U.S. App. LEXIS 21686 (6th Cir. 1998) (hereinafter *Kentucky 1998*). Commenters argue that those decisions are invalid because they ''relied on *Chevron*[3] deference,'' and *Chevron* was overruled by *Loper Bright Enterprises* v. *Raimondo,* 603 U.S. 369 (2024) (hereinafter *Loper Bright*). Thus, EPA received comment contending that EPA's interpretation of CAA section 107(d)(3)(E)(i) warrants judicial reexamination.

*Response 1:* EPA has historically interpreted CAA section 107(d)(3)(E)(i) to require continued attainment until EPA's final action redesignating a nonattainment area and did not propose a different or additional interpretation in the NPRM. *See* 90 FR at 295, January 3, 2025. Applying that interpretation to the particular facts and circumstances of the Kentucky portion of the Louisville KY-IN area, EPA is denying the reclassification request for lack of continued attainment and to satisfy a consent decree obligation to take final action by January 20, 2026.[4] This final action should not be construed as taking a definitive view on the cases cited and arguments presented by commenters beyond the Agency's decision, for purposes of this action, to apply the historical interpretation described at proposal.

*Comment 2:* Commenters contend that, even if CAA section 107(d)(3)(E)(i) requires continued attainment, that requirement ends when the 18-month timeframe established by section 107(d)(3)(D) expires. Commenters note that section 107(d)(3)(D) provides that EPA ''shall'' approve or deny a redesignation request within ''18 months of receipt of a complete State redesignation submittal.'' These commenters argue that this provision should be interpreted as preventing EPA from considering any information that became available more than 18 months after receipt of a complete state redesignation submittal. Because KDAQ's redesignation request was submitted on September 6, 2022, these commenters argue that EPA should not be allowed to consider any data that became available after March 6, 2024. One commenter asserts that CAA Section 107(d)(3) ''does not give EPA the authority to reverse a redesignation based on post-deadline data.''

In support of this argument, commenters assert that EPA improperly relies on *Browner* and *Kentucky 1998,* mentioned above. One commenter notes that that the petitioners in *Browner* failed to raise the 18-month deadline argument during the rulemaking process, and thus the argument was forfeited. This commenter asserts that *Kentucky 1998* ''adds little'' because it is unpublished, and EPA did not miss any deadline to act in that case. The commenters argue that if EPA is allowed to consider data that became available after the 18-month timeframe, then ''there is no consequence'' for EPA not acting. One commenter contends that EPA's interpretation of section 107(d)(3)(E)(i) allows it to ''move the goal post'' because areas must continue to attain the NAAQS after the 18-month timeframe. The commenter asserts that states cannot know ''what data the [EPA] will consider in acting on a redesignation request,'' if EPA is allowed to consider data after the 18-month timeframe established by section 107(d)(3)(D).

The commenters argue that a court will enforce the mandatory section 107(d)(3)(D) deadline following legal challenge by preventing EPA from considering certain data. They point to a concurring opinion in *Kentucky* v. *EPA,* 123 F.4th 447 (6th Cir. 2024) (*Kentucky 2024*) to argue that the Administrative Procedure Act (''APA'') authorizes a court to prevent an agency from ''using data generated after its deadline to act.'' *See* 123 F.4th at 474 (Murphy, J., concurring). The commenter notes that APA section 706(2)(A) allows a court to set aside an agency action that is ''not in accordance with the law.'' The commenter argues the use of the word ''shall'' in CAA section 107(d)(3)(D) suggests that EPA lacks discretion to miss the 18-month deadline to approve or deny a redesignation request. The commenter then contends that consideration of post-deadline ''monitoring data is not in accordance with the law'' because EPA did not finalize an action ''on Kentucky's redesignation request within the timeframe established by Section 107(d)(3)(D).'' The commenter further argues that EPA's failure to abide by the statutory deadline had a ''substantial influence'' on the outcome of the request because it allowed EPA to consider post-deadline monitoring data.

*Response 2:* As discussed in Response 1, EPA has historically interpreted CAA section 107(d)(3)(E)(i) to require continued attainment until EPA's final action redesignating a nonattainment area and did not propose a different or additional interpretation in the NPRM. Applying that interpretation to the particular facts and circumstances here, EPA is denying the reclassification request for lack of continued attainment and to satisfy a consent decree obligation to take final action by January 20, 2026. This final action should not be construed as taking a definitive view on the cases cited and arguments presented by commenters, including with respect to potential legal implications of the 18-month statutory deadline, beyond the Agency's decision, for purposes of this action, to apply the historical interpretation described at proposal.

*Comment 3:* Commenters state that EPA ''delayed'' processing KDAQ's redesignation request, with one commenter asserting that this ''delay is the sole reason the Kentucky portion of the [Area] is not designated attainment.'' EPA received a comment asserting that EPA's ''delay in making a final decision on Kentucky's redesignation request short-circuits the statutory process.'' Commenters argue that their interpretation of CAA section 107(d)(3)(E)(i) that would prevent EPA from considering data after the 18-month deadline is best because it would prevent EPA from engaging in ''unreasonable delay.'' If EPA's interpretation is accepted, commenters contend that the CAA section 107(d)(3)(D) deadline would be ''wholly nullifie[d]'' and ''toothless.'' They claim that EPA's interpretation ''indicates there is no consequence'' for delay and allows the Administrator to wait ''until data becomes available that allows him to deny the [redesignation] request.''

*Response 3:* EPA disagrees that ''delay'' on the Agency's part is the ''sole reason'' why the Kentucky portion of the Area is not being designated as attainment. Rather, EPA is denying the reclassification request for lack of continued attainment and to satisfy a consent decree obligation to take final action by January 20, 2026. As discussed in Responses 1 and 2, EPA is relying on its historical interpretation of CAA section 107(d)(3)(E)(i) and did not propose a different or additional interpretation in the NPRM. EPA notes that the Agency provided support to KDAQ during the preparation of the redesignation request and associated maintenance plan and encouraged the Commonwealth to submit the request and plan as soon as possible. EPA also assisted LMAPCD by providing resources to aid in preparing its EE demonstration. The Agency stands ready to engage further with KDAQ, LMAPCD, and the Commonwealth to support efforts to bring the Kentucky portion of the Area into attainment status.

[3] *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).

[4] *See Commonwealth of Kentucky* v. *EPA,* No. 3:24–CV–600–CHB (W.D. Ky.).

*Comment 4:* Many of the commenters argue that the data available to EPA within CAA section 107(d)(3)(D)'s 18-month timeframe was attaining the NAAQS. One commenter notes that 2023 monitoring data was not certified until after expiration of the 18-month deadline and that EPA's redesignation guidance states that air monitoring data should be ''collected and quality-assured in accordance with 40 CFR 58.'' [5] This commenter then cites 40 CFR 58.15, containing annual air monitoring data certification requirements, and argues that 2023 monitoring data was not ''quality assured in accordance with 40 CFR 58'' until May 1, 2024, when KDAQ submitted its annual certification letter. Another commenter similarly argues that during the 18-month statutory review period, ''only the 2019–2021 and 2020–2022 design values met the necessary regulatory criteria in 40 CFR part 50.''

*Response 4:* EPA has previously considered preliminary monitoring data in assessing whether an area should be redesignated, including when EPA initially proposed approving KDAQ's present redesignation request. *See* 88 FR 23598, 23601, April 18, 2023 (''Preliminary 2022 ozone monitoring data currently indicates attaining 2022 design values for the Louisville, KY-IN Area.''). Here, the information available to EPA on March 6, 2024, at least raised questions whether the Area was attaining the 2015 ozone NAAQS. EPA did not propose a different understanding of applicable law and regulations in the NPRM. Under these facts and circumstances, and as noted in Responses 1, 2, and 3, EPA is applying its historical interpretation of CAA section 107(d)(3)(E)(i) to the particular facts and circumstances here by denying the reclassification request for lack of continued attainment and to satisfy a consent decree obligation to take final action by January 20, 2026.

*Comment 5:* EPA received comments noting that LMAPCD was completing an EE demonstration during the comment period for the NPRM to account for monitoring data impacted by the 2023 Canadian Wildfires. A commenter argues that use of 2023 monitoring data is ''improper'' because the data was ''incomplete'' until LMAPCD submitted the EE demonstration. Another commenter contends that the appropriate ''contingency measure'' for the 2023 exceedances is the submittal of an EE demonstration. Commenters assert that at the ''direction of EPA, air agencies were advised to submit'' EE demonstrations to account for the 2023 Canadian Wildfires. EPA received comment asserting that EPA advised states that it would develop a tool to assist with the development of EE demonstrations—the Expedited Modeling of Burn Events Results (EMBER)—that was not released until December 2024. A commenter suggests that LMAPCD's EE demonstration was ''delayed while waiting for EPA to release EMBER.''

EPA received comment stating that EPA must ''acknowledge the Canadian Wildfires'' and that EPA would act ''arbitrarily'' if it denied KDAQ's redesignation request without considering the EE demonstration. A commenter asserts that the EE demonstration ''will demonstrate that the Louisville Area continues to attain the ozone standard''. LMAPCD's comment acknowledges the 2024 ozone exceedances and asserts, without further explanation, that it ''is evaluating the cause of those exceedances.'' Finally, LMAPCD notes that a coal-fired boiler (Mill Creek Unit 1) was scheduled to shut down on December 31, 2024.

*Response 5:* To be excluded from the complete, certified 2023 monitoring data, LMAPCD had to submit an EE demonstration showing ''to the Administrator's satisfaction that [an exceptional] event caused a specific air pollution concentration at a particular air quality monitoring location.'' 40 CFR 50.14(a)(1) (ii); *see also* 40 CFR part 50 App'x U, section 1(b) (''Whether to exclude or retain the data affected by exceptional events is determined by the requirements under §§ 50.1, 50.14 and 51.930.''). LMAPCD submitted the EE demonstration on June 11, 2025. LMAPCD's EE demonstration does not have regulatory significance for this action [6] because even if EPA were to concur on all nine days in the EE demonstration, the Area's complete certified 2022–2024 DV would be 0.073 ppm, and the preliminary 2023–2025 DV would be 0.072 ppm. Thus, even if EPA were to concur on all nine days in the EE demonstration, the Agency cannot redesignate the Kentucky portion of the Area to attainment based on current data under the historical interpretation referenced above in Responses 1, 2, 3, and 4.

*Comment 6:* One commenter notes that CAA section 107(d)(3)(E)(i) requires a determination that ''the area'' has attained the NAAQS. The commenter contrasts this language with the language in CAA section 107(d)(3)(D) and (E) referring to an area ''or portion thereof.'' Thus, the commenter contends that EPA ''must determine that an entire area has attained the relevant NAAQS, even if [a] redesignation request is only for a portion of the area.'' Because EPA Region 5 approved the redesignation of the Indiana portion of the Area, the commenter argues that EPA has ''determined that the entire Louisville Area has attained the 2015 8-hour ozone NAAQS.'' Based on this assertion, the commenter argues that KDAQ does not need to meet the ''requirement of Section 107(d)(3)(E)(i)'' to support its redesignation request.

*Response 6:* For EPA to redesignate a portion of a multistate area from nonattainment to attainment, all the requirements of CAA section 107(d)(3)(E) must be met. As noted above in Responses 1, 2, 3, 4, and 5, EPA is relying on its historical interpretation of CAA section 107(d)(3)(E)(i) for purposes of this final action and did not propose an additional or different interpretation in the NPRM, including with respect to the interpretation of ''area'' and the potential impact of the Indiana portion of the Area. Therefore, EPA is denying the reclassification request for lack of continued attainment and to satisfy a consent decree obligation to take final action by January 20, 2026.

*Comment 7:* EPA received comments asserting that CAA section 301(a)(2)(A) requires EPA regions to process requests ''with similar diligence and timeliness'' and in a consistent ''timeframe'' while noting that the section requires the Administrator to ''promulgate regulations'' to ''assure fairness and uniformity in the criteria, procedures, and policies applied by the various regions in implementing and enforcing the [CAA].'' Commenters argue that Region 4's failure to act in a timeframe consistent with Region 5's handling of IDEM's request did not assure fairness and uniformity because Region 4 would have approved KDAQ's redesignation request based on 2019–2021 data had it followed Region 5's timeframe. EPA received comment asserting that the ''primary difference between the two redesignation requests'' is that IDEM's request was ''timely reviewed,'' but Region 4 ''delayed making a final decision'' on KDAQ's request.

[5] Citing to *Procedures for Processing Requests to Redesignate Areas to Attainment,* Memorandum from John Calcagni, Director, Air Quality Management Division, September 4, 1992 (Calcagni Memorandum).

[6] On August 12, 2025, EPA concurred on six of the nine days in the EE demonstration. Exclusion of those EE days from the monitoring data would reduce the 2021–2023 DV to 0.070 ppm. As such, the EE demonstration has regulatory significance for purposes of determining whether the Area attained the 2015 ozone NAAQS as of the applicable August 3, 2024, Moderate attainment date.

A commenter asserts that CAA section 301(a)(2)(A) prohibits EPA regions from taking ''separate actions on a multi-state nonattainment area'' because doing so results in contradictory regulations, delayed action, and a lack of accountability and ''introduces unnecessary complexity and inefficiency in the regulatory process.'' The commenter further asserts that EPA ''arbitrarily withdr[ew] the first attainment determination'' which generates additional work and wastes taxpayer dollars. Another commenter contends that EPA cannot explain ''how differently the two requests for redesignation requests were processed by Region [4] and Region [5].'' A third commenter asserts that the CAA prohibits EPA from ''ignor[ing] statutory deadlines depending on which of its offices processes a request.'' Finally, commenters contend that ''inconsistent determinations by EPA'' or failing to act in a ''uniform'' timeframe are ''arbitrary and capricious.''

*Response 7:* CAA section 301(a)(2) requires the EPA Administrator to promulgate regulations establishing general applicable procedures and policies to, among other things, assure fairness and uniformity in the criteria, procedures, and policies applied by the various regions in implementing and enforcing the CAA. *See* 42 U.S.C. 7601(a)(2)(A). EPA complied with this section by promulgating regional consistency regulations under 40 CFR part 56, including a regulation stating that it is EPA policy to ''[a]ssure fair and uniform application by all Regional Offices of the criteria, procedures, and policies employed in implementing and enforcing the [CAA].'' 40 CFR 56.3(a). As it relates to KDAQ's redesignation request, Region 4 is applying the same redesignation ''criteria, procedures, and policies'' that Region 5, and all other regions, follow. The different outcomes between KDAQ's request and IDEM's request is the result of EPA's application of its historical interpretation of CAA section 107(d)(3)(E)(i) to the particular facts and circumstances here.

*Comment 8:* One commenter asserts that it is ''facially inconsistent'' for the Kentucky portion of the Area to be designated nonattainment when the Indiana portion is designated attainment. This commenter also argues that it is ''unlawful'' for EPA to determine that the Kentucky portion of the Area is nonattainment ''based on the same monitoring data'' that Indiana submitted in support of its redesignation request. The commenter further contends that multistate nonattainment areas have historically ''been treated as a single air quality management zone, with consistent actions applied across both states.'' According to this commenter, the Louisville Area is the only multistate area that currently that has different attainment designations. The commenter argues that having a multistate area with differing attainment designations will undermine regional planning efforts and contends that ''past and current practices'' dictate that the Louisville Area be designated ''as a single unit.'' One commenter argues that *Browner* and *Kentucky 1998* are inapplicable because they did not involve ''a situation where the EPA's denial of a redesignation request results in a single air quality control region being split into two different attainment designations.''

EPA received comment asserting that differing attainment designations will result in the Kentucky portion of the Area facing stricter emissions regulations than the Indiana portion. Commenters contend this creates an economic disadvantage for businesses and the public in Kentucky. Commenters further argue that differing attainment designations will result in an unfair distribution of the regulatory burden when Kentucky and Indiana should be working together and sharing responsibility for ensuring clean air. They claim that a uniform designation for the Area is the only way to create a predictable regulatory structure and prevent economic imbalances.

*Response 8:* Each state must submit its own redesignation request for the portion of a multistate area within its borders, and EPA must assess those requests under the factors set out in CAA section 107(d)(3)(E). EPA is not denying KDAQ's redesignation request ''based on the same monitoring data'' that IDEM submitted in support of its request. EPA approved IDEM's redesignation request on July 5, 2022, because the Area's DV demonstrated attainment of the NAAQS. With respect to KDAQ's request, the facts and circumstances presented a different record. As discussed above, EPA is basing this decision on its historical interpretation of CAA section 107(d)(3)(E)(i) and did not propose a different or additional interpretation in the NPRM. EPA is denying the reclassification request for lack of continued attainment and to satisfy a consent decree obligation to take final action by January 20, 2026.

*Comment 9:* Several commenters argue that the contingency measures in the proposed maintenance plan KDAQ submitted along with its redesignation request would adequately correct the NAAQS violation that has occurred. A commenter asserts that EPA relies on a ''semantic argument'' in proposing to deny KDAQ's redesignation request, and that EPA's actions render the contingency measures in a maintenance plan ''superfluous.'' EPA received a comment asserting that EPA's ''inability to act on Kentucky's redesignation request'' will ''result in a penalty for the Kentucky portion of the Louisville Area.'' Another commenter claims that if the Area is ''designated a nonattainment area as proposed by EPA,'' Kentucky will face ''sanctions'' and be required to impose regulations that are more stringent than those in the proposed maintenance plan. This commenter states that EPA could still consider the monitored ozone exceedances and that ''it may be appropriate for EPA to require Kentucky to determine if additional measures are necessary to maintain attainment.'' Commenters assert that the contingency measures in the maintenance plan would be less burdensome than the statutory requirements for a nonattainment area. A commenter argues that the ''harms'' of nonattainment area requirements ''can be avoided if EPA simply adopts the best reading of the [CAA].''

EPA received comment contending that EPA ''acknowledged the redesignation request was approvable in a prior proposed action'' and that EPA ''could easily approve the redesignation request and allow the contingency measures to be implemented.'' A commenter asserts that EPA would undermine the CAA by not ''allowing the safeguards in the SIP to play out'' and that states have no incentive to ''prepare contingency measures'' if EPA does not allow them to use those measures ''to account for fluctuating design values.'' This commenter claims that the Louisville situation is ''likely to become the norm'' because ''the NAAQS continue to become more stringent.'' The commenter further argues that EPA should show ''faith in the [CAA] and faith in state and local air agencies to implement contengency [*sic*] measures effectively.''

*Response 9:* The Kentucky portion of the Area has been designated nonattainment since August 3, 2018. *See* 83 FR 25776, June 4, 2018. EPA is denying a redesignation to attainment because it concludes on these facts and circumstances that, under the Agency's historical interpretation of CAA section 107(d)(3)(E)(i), KDAQ's request does not meet the statutory requirements. *See* 42 U.S.C. 7407(d)(3)(E). CAA section 175A provides that nonattainment requirements ''shall continue in force and effect'' for ''any area designated as

a nonattainment area'' until that ''area is redesignated as attainment.'' 42 U.S.C. 7505a(c).

An area cannot be redesignated unless a state prepares and submits ''a maintenance plan for the area'' as a SIP revision, the maintenance plan includes contingency measures, and EPA approves that plan. 42 U.S.C. 7407(d)(3)(E)(iv), 7505a(a), (d). However, that does not mean an area can be redesignated without meeting the other requirements of CAA section 107(d)(3)(E). The fact that KDAQ's proposed maintenance plan has contingency measures is not relevant to the question whether the Area has attained the NAAQS.

*Comment 10:* EPA received comments noting that the design of the CAA requires ''cooperative federalism'' with EPA working together with state and local agencies as co-regulators protecting human health and the environment. Commenters point out that EPA approved IDEM's request and argue that EPA would waste limited government resources by denying the KDAQ redesignation request. EPA received a comment asserting that EPA's ''inaction'' goes against the CAA's goal of cooperative federalism. Commenters assert that approving the redesignation request ''upholds EPA's end of the [cooperative federalism] bargain.''

*Response 10:* EPA works closely with state and local agencies under the CAA's cooperative federalism framework. EPA worked with LMAPCD, KDAQ, IDEM and other regional partners on the redesignation requests for the Area. Part of the CAA's cooperative federalism structure allows each state to submit its own redesignation request for areas (or portions of areas) with the state. *See* 42 U.S.C. 7407(d)(3)(D). For the reasons stated above, EPA is applying its historical interpretation of CAA section 107(d)(3)(E)(i) to the particular facts and circumstances presented here to deny the reclassification request for lack of continued attainment and to satisfy a consent decree obligation to take final action by January 20, 2026. This decision does not take away from the Commonwealth's considerable discretion in other respects under the statute to implement the NAAQS, and EPA is committed to further engagement with all relevant parties to further the CAA's cooperative federalism framework.

## III. Final Action

EPA is denying KDAQ's September 6, 2022 redesignation request because the Area has not met the first redesignation criterion. *See* 42 U.S.C. 7407(d)(3)(E)(i). EPA is not taking action on KDAQ's accompanying maintenance plan SIP revision to fulfill the other redesignation criteria, given its denial of the request based on air quality data.

## IV. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### *A. Executive Order 12866: Regulatory Planning and Review*

This action is not a significant regulatory action as defined in Executive Order 12866 and was therefore not subject to a requirement for Executive Order 12866 review.

### *B. Executive Order 14192: Unleashing Prosperity Through Deregulation*

This action is not subject to Executive Order 14192 because this action is not significant under Executive Order 12866.

### *C. Paperwork Reduction Act (PRA)*

This action does not impose an information collection burden under the PRA because it does not contain any information collection activities.

### *D. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA (5 U.S.C. 601 *et seq.*). This action will not impose any requirements on small entities because it merely denies a redesignation request as not meeting federal requirements.

### *E. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

### *F. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

### *G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications, as specified in Executive Order 13175, because the SIP is not approved to apply on any Indian reservation land or in any other area where EPA or an Indian tribe has demonstrated that a tribe has jurisdiction and will not impose substantial direct costs on tribal governments or preempt tribal law. Thus, Executive Order 13175 does not apply to this action.

### *H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the Executive Order. Therefore, this action is not subject to Executive Order 13045 because it merely denies a redesignation request as not meeting federal requirements. Furthermore, EPA's Policy on Children's Health does not apply to this action.

### *I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211 because it is not a significant regulatory action under Executive Order 12866.

### *J. National Technology Transfer and Advancement Act (NTTAA)*

This action does not involve technical standards.

### *K. Congressional Review Act (CRA)*

This action is subject to the CRA, and EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

*L. Petitions for Judicial Review*

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by March 30, 2026. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this rule for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements (*see* section 307(b)(2)).

**List of Subjects in 40 CFR Part 81**

Environmental protection, Air pollution control, National parks, Wilderness areas.

**Authority:** 42 U.S.C. 7401 *et seq.*

Dated: January 20, 2026.

**Kevin McOmber,**

*Regional Administrator, Region 4.*

[FR Doc. 2026–01772 Filed 1–28–26; 8:45 am]

**BILLING CODE 6560–50–P**